JOHN L. BURRIS, ESQ., SBN 69888
**BEN NISENBAUM, ESQ., SBN 222173**
**JAMES COOK, ESQ., SBN 300212**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Center
7677 Oakport Street, Suite 1120 Oakland, CA 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882
Email: John.Burris@johnburrislaw.com
Email: Ben.Nisenbaum@johnburrislaw.com
Email: James.Cook@johnburrislaw.com

Attorneys for Plaintiffs
MARIA TERESA GONZALEZ, et al.,

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA TERESA GONZALEZ, et al., | Case No.: 1:21-cv-01091-ADA-HBK |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT** |
| v. | **Date**: |
| COUNTY OF STANISLAUS, et al., | **Time**: |
| | **Location**: |
| Defendants. | **Trial Date**: |
| | **Judge**: |

## TABLE OF CONTENTS

Table of Authorities ...................................................................................................................iv

Introduction ...................................................................................................................................1

Statement of Facts.........................................................................................................................2

1. Defendant Deputies were responding to a silent burglary alarm when they approached Mr. Gonzales.................................................................................................................................3

2. The Defendant Deputies Arrive on the Scene/Fail to Develop a Tactical Plan............................3

i

3. The Deputies' Failed to Factor Mr. Gonzalez's Mental Health into their Use of Force in Violation of his Constitutional Rights, and Their Actions Were Consistent with the City's Policy and Ratified by the City ...................................................................................................5

Argument ...................................................................................................6

A. Legal Standards ...................................................................................................6

B. The Deputies' Use of Force was Unreasonable ...................................................................................................7

    1) Legal Standards ...................................................................................................8

    2) Nature of Intrusion ...................................................................................................8

    3) Government Interests ...................................................................................................8

    4) Mr. Gonzalez did not Commit a Crime and was Not Actively Resisting Arrest or Attempting to Flee...................................................................................................8

    5) Whether Mr. Gonzalez Posed a Threat is a Question for the Jury .........................................9

    6) The Other Factors Favor Plaintiffs ...................................................................................................10

    7) Less Intrusive Alternatives ...................................................................................................10

    8) Apparent Mental Disturbance...................................................................................................11

    9) Right of Resistance to Excessive Force...................................................................................................12

C. The Deputies Are Not Entitled to Qualified Immunity...................................................................................................13

    1) Viewing the Facts Favorable to Plaintiffs, the Right at Issue is Clearly Established...........14

    2) Fact Questions Preclude Deciding Qualified Immunity on Summary Judgment.................15

D. Fourteenth Amendment...................................................................................................16

E. State Law Claims ...................................................................................................17

    1) Negligence ...................................................................................................17

    2) Remaining State Law Claims ...................................................................................................18

    3) No State Law Immunities ...................................................................................................19

Conclusion ...................................................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016) ..............................8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................6

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007)..............................13

*Boarman c. City of Sacramento*, 55 F.Sup 3d (E.D. 2014)..............................12

*Brown v. Ransweiler*, 171 Cal. App. 4th 516 (2009)..............................18

*Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010) ..............................8,9, 14

*C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252 (9th Cir. 2016) ..............................12, 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................6, 7, 18

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)..............................16

*Crawford v. City of Bakersfield*, 944 F.3d 1070 (9th Cir. 2019) ..............................12

*Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991)..............................15

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) ..............................10, 14

*District of Columbia v. Wesby*, 138 S.Ct. 577 (2018)..............................14

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) ..............................12

*Espinosa v. City & County of San Francisco*, 598 F.3d 528 (9th Cir. 2010) ..............................15

*George v. Morris, 763 F.3d 838,* ..............................15

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) ..............................15

*Graham v. Connor*, 490 U.S. 386 (1989) ..............................8

*Greer v. City of Hayward*, 229 F.Supp.3d 1091 (N.D. Cal. 2017) ..............................17

*Grudt v. City of Los Angeles*, 2 Cal.3d 575 (1970)..............................18

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..............................13

*Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013)..............................17, 18

*Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013) ..............................17

*Hope v. Pelzer*, 536 U.S. 730 (2002) ..............................14

*Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017)..............................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..............................7

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ................................................................ passim

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365 (9th Cir. 1998) ...................................... 16

*Mulligan v. Nichols*, 835 F.3d 983 (9th Cir. 2016) ........................................................................ 18

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) ........................................................................ 16, 17

*Reese v. Cty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) .......................................................... 18

*S.B. v. Cty. of San Diego*, 864 F.3d 1010 (9th Cir. 2017) ................................................................ 10

*Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002) ............................................................................ 15, 16

*Saucier v. Katz*, 533 U.S. 194 (2001) ............................................................................................ 13

*Scott v. Harris*, 550 U.S. 372 (2007) .............................................................................................. 7

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) ............................................................................... 11

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) .................................................................... 11

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626 (9th Cir. 1987) ................. 7

*Tan Lam v. City of Los Banos*, 976 F.3d 986 (9th Cir. 2020) .......................................................... 17

*Taylor v. Riojas*, 141 S.Ct. 52 (2020) ............................................................................................ 14

*Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018) .................................................... 11, 14

*Winkler v. City of Phoenix*, 849 Fed. App'x. 664 (9th Cir. 2021) .................................................. 11

**Statutes**

Federal Rules of Civil Procedure, Rule 56(a) .................................................................................. 6

**California Statutes**

Government Code § 815.2 ............................................................................................................ 19

Government Code § 820.2 ............................................................................................................ 19

Government Code §820.8 ............................................................................................................. 19

Penal Code § 835(a) ................................................................................................................... 19

**JOHN L. BURRIS, ESQ., SBN 69888**
**BEN NISENBAUM, ESQ., SBN 222173**
**JAMES COOK, ESQ., SBN 300212**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Center
7677 Oakport Street, Suite 1120 Oakland, CA 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882
Email: John.Burris@johnburrislaw.com
Email: Ben.Nisenbaum@johnburrislaw.com
Email: James.Cook@johnburrislaw.com

Attorneys for Plaintiffs
MARIA TERESA GONZALEZ, et al.,

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA TERESA GONZALEZ, et al.,<br><br>              Plaintiffs,<br><br>       v.<br><br>COUNTY OF STANISLAUS, et al.,<br><br>              Defendants. | Case No.: 1:21-cv-01091-ADA-HBK<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Judge:** Hon. Ana de Alba |

## INTRODUCTION

In the early morning of September 27, 2020 Stanislaus County Sheriff's Deputies arrived at 800 block of Business Park Drive to investigate a burglar alarm. They found Mr. Gonzalez seated in a make-shift cardboard shelter, which he had situated along an exterior wall of an office building. The deputies approached him and immediately began shouting commands. Gonzalez placed his hands in the air. He verbally responded in a manner indicating that he was having a mental health crisis: "My father is a Senator... he owns the building. Put your guns away. If you shoot me, you're are not doing your job."

Defendants Lewis and Silva arrived on scene shortly after the initial group of officers, and they also began shouting commands and adding to the chaos and cacophony of shouting voices and emergency lights. Deputy Lewis took charge and threatened Gonzalez with the police dog. The dog barked and growled aggressively just a short distance away from where Gonzalez sat with his hands raised. He continued his nonsensical responses to the officers' commands.

Deputies then initiated a confrontation by firing a rubber bullet at Gonzalez's head. Lewis, then "sicced" the dog on Gonzalez. The K9 latched onto Gonzalez's arm. Lewis advanced following the dog. While the dog bit into Gonzalez's arm, Lewis punched him in his head and neck. Gonzalez kept his hand in the air after initially attempting to pet the dog. After several blows from Lewis, Gonzalez made a half-hearted attempt to protect himself by swinging an axe upward. Deputy Silva opened fire just a few feet behind Gonzalez's back. Simultaneously, Lewis unholstered and opened fire just a few feet in front of Mr. Gonzalez. Gonzalez died a short time later.

At most, Gonzalez was trespassing. However, Deputies escalated the encounter despite Gonzalez having his hands up. The Officers raised the stress level, while Gonzalez did not present a threat to the officers or public safety. The deputies' conduct increased the temperature of the encounter notwithstanding their Crisis Intervention Training which focuses on arrest subjects experiencing mental health crises. Despite the availability of less lethal alternatives the defendant deputies created a situation which required them to shoot their way out of it.

Amongst other causes of action, Plaintiffs assert that decedent, was subjected to Excessive force in violation of 42 U.S.C. Section 1983. Further plaintiffs assert that Mr. Gonzalez rights were violated under California Civil Code Section 52.1.

Based on the discussion below, Plaintiffs move, pursuant to Rule 56, that this Court find that defendants used excessive force on decedent Gonzalez in violation of 42 U.S.C 1983 and California Civil Code Section 52.1. Furthermore, plaintiffs request that the Court find that the defendant deputies were not protected by Qualified Immunity. Plaintiffs also oppose Defendants' motion for summary judgment.

## STATEMENT OF FACTS

**1.    Defendant Deputies were responding to a silent burglary alarm when they approached Mr. Gonzalez.**

Deputies Sierra and Noel were responding to a silent commercial burglary alarm when they encountered Mr. Gonzalez in a make-shift cardboard shelter along an exterior wall of the office building near 800 Business Park Drive in Modesto, CA. (Deputy Sierra Report, Pg. 5). When Defendants Sierra and Noel approached Mr. Gonzalez's area, they immediately started yelling profanities and threats at him, ordering him to put his hands up and walk forward. (Deputy Sierra Body Worn Camera ("BWC") Footage at 06:08). Mr. Gonzalez was not suspected of having any involvement in a potential burglary.

**2.    The Defendant Deputies Arrive on the Scene/Fail to Develop a Tactical Plan**

Mr. Gonzalez noticed the multiple sheriff's deputies walking near him and said, "Hey, what's up man?" Immediately, the deputies told Mr. Gonzalez to put his hands up. Mr. Gonzalez exhibited confusion at the deputies' combative behavior towards him, and he tried to figure out what was happening. (Sierra BWC, 06:30). Deputies immediately began yelling at Mr. Gonzalez, telling him to put his hands up and saying, "You're going to get tased." Mr. Gonzalez responded with, "For what?" and then he held up his hands to show the deputies that he was not holding any objects. (Sierra BWC, 07:55).

Despite no indication of any threat, deputies continued to demand that Mr. Gonzalez walk out of his cardboard enclave with his hands on his head. Mr. Gonzalez remained standing in place, with his hands visible, telling the deputies that his father owned the building and stating, "I'm staying outside for a reason," and "I'm sitting down because this is all I got. This is all I got." Mr. Gonzalez then sat down on the sidewalk ledge, continuing to speak to the deputies in a calm tone of voice, with his hands still visible the entire time. (Sierra BWC, 06:50).

Multiple additional deputies including Lewis, Silva, Gomez, Coffman, Valera, Borba, and Cummings arrived at the scene, including a K-9 unit with Lewis, and they continued to threaten Mr. Gonzalez, yelling things like, "Show us your hands or we'll send the dog." (Lewis BWC, 13:09). Mr. Gonzalez, still with his hands visible to the deputies, responded, "My hands are right here." His hands remained empty. (Lewis BWC, 13:13; Lewis Depo ("Depo"), 37:8-23; Silva Depo, 73:4-12)

The K-9 dog barked continuously as the deputies yelled commands at Mr. Gonzalez. Deputy Gomez discharged a beanbag shotgun at Mr. Gonzalez. (Lewis Depo 33:19-34:1). Gonzalez's hands were up and visible when he was shot with the beanbag round. (Silva BWC, 14:16; Gomez Depo, 44:9-14, 49:21-50:2; Lewis Depo, 26:5-12, 32:5-9, 37:8-12; Coffman Depo, 33-36, 47-48; Gomez Depo, 44:9-14, 48:7-12, 49:20 – 50:2; Perez Depo, 33-35). Immediately after the beanbag shot, Deputy Lewis released the K-9 on Gonzalez. The K-9 began biting Gonzalez. (Lewis BWC, 14:17; Lewis Depo, 32:10-15, 34:9-13). Mr. Gonzalez struggled to protect himself from the K-9. (Lewis BWC, 14:17; Lewis Depo, 34:9-13; Coffman Depo, 26, 40). At the same time that deputy Lewis released the K-9, all of the deputies began rushing to tackle Mr. Gonzalez. (Lewis BWC, 14:18). Deputy Lewis shouted at Gonzalez "stop fighting my dog" and "don't punch my dog" while pushing and shoving him. (Lewis BWC, 14:22; and Lewis Depo, 49:2-9). Deputy Sierra attempted to pull Deputy Lewis away from Gonzalez. Deputy Lewis punched Gonzalez in the head and then shoved him in the head. (Lewis BWC, 14:23; and Lewis Depo, 48:11-13, 49:1-9).

Up until the point that Deputy Sierra attempted to pull Lewis off of Gonzalez, Gonzalez was not fleeing, actively resisting arrest, or a threat to the Deputies or public when the deputies arrived on scene. At most, the deputies suspected that Gonzalez set off an alarm, and was refusing to come out of his sleeping area. The deputies did not suspect Gonzalez of any other crimes or threats. (Silva Depo, 71:3-72:3; 75:15-76:5; Lewis Depo, 40:11-42:22. Coffman Depo, 36-38; Gomez Depo, 23:1-18; Condit Depo, 39-40; Letras Depo, 55-56; DeCroix Depo, 36)

Mr. Gonzalez remained seated but picked up a wood-handled tool when the Defendants rushed him. (Clark Expert Report, pg. 5.) He never threatened anyone with it, and held it defensively only. (Lewis BWC; Lewis Depo, 29:8-11; Coffman Depo, 26, 40; Perez Depo, 43-45, 51). At this time, deputies exclaimed that they saw an object located underneath Mr. Gonzalez's belongings. One deputy asked, "Is that a knife?" to which another deputy responded, "It looks like some kind of tool."

Deputies Lewis, Silva, and Coffman then opened fire on Gonzalez, striking him multiple times. (Lewis BWC, 14:29; Lewis Depo, 28:19-29:4.; Silva Depo, 66:10-17). Gonzalez was struggling to protect himself from the police K9 pushing him against the wall when deputies shot

him. (Lewis BWC, 14:19, Lewis Depo, 49:2-22)..Deputy Lewis fired his weapon three times, at close range, while standing directly over Mr. Gonzalez. (Lewis Depo, 50:23-51:12). The deputies did not warn Gonzalez that they intended to use lethal force. Nor did the deputies warn Gonzalez that they were going to fire their weapons. (Lewis BWC, 14:29; and Lewis Depo, 50:11-18).

At no point during this incident did Mr. Gonzalez pose a threat to the deputies. He did not make attempts to attack the deputies. He did not pose a threat to public safety. The escalation of events could have been avoided if the Defendants followed their de-escalation training and only used a reasonable level of force. (Silva Depo, 71:3-72:3; 75:15-76:5; Lewis Depo, 40:11-42:22. Coffman Depo, 36-38; Gomez Depo, 23:1-18; Condit Depo, 39-40; Letras Depo, 55-56; DeCroix Depo, 36).

### 3. The Deputies' Failed to Factor Mr. Gonzalez's Mental Health into their Use of Force in Violation of his Constitutional Rights, and Their Actions Were Consistent with the City's Policy and Ratified by the City

Deputies failed to conduct a proper assessment to determine whether Mr. Gonzalez was mentally impaired, despite all being trained in Crisis Intervention Training. (Lewis Depo, 65:3-15; Silva Depo, 69:3-13, 92:4-10; Coffman Depo, 18:3-17, 32:4-11.)

Despite no indication of any threat from the Decedent, deputies continued to demand that Mr. Gonzalez walk out of his cardboard enclave with his hands on his head. Mr. Gonzalez told the deputies that his father owned the building and made other statements that made it obvious he was mentally impaired. (Sierra BWC, 06:47). Mr. Gonzalez did not understand the full reality of what was happening and was clearly mentally impaired. (Gonzalez Medical Records, pg. 3; Clark Expert Report, pg. 8). Mr. Gonzalez exhibited confusion at the deputies' inflammatory and combative behavior towards him. (Sierra BWC, 06:30). He showed them his empty hands and asked what was going on. (Sierra BWC, 06:30). One deputy told Mr. Gonzalez that he would be arrested if he did not comply. Mr. Gonzalez responded, "Well you're going to have to explain that to the President." Despite this signal that Mr. Gonzalez may not have understood the reality of what was happening and was exhibiting diminished mental capacity, sheriff's deputies continued to escalate the situation.

Deputies Lewis and Silva acknowledge training in de-escalation tactics related to POST certification. They also acknowledge training and or familiarity with Crisis Intervention Training in

relation to encounters with mentally ill arrest subject. They also acknowledge that less lethal tools such as tasers were available for the purpose of subduing Mr. Gonzalez.

Plaintiffs further allege that Decedent's death was the proximate result of Defendant County's failure to reasonably train their sheriff's deputies in the proper and reasonable use of force, failure to reasonably train their sheriff's deputies in responding to mentally impaired people, and using force in a manner to reasonably avoid killing people. Plaintiffs further allege that these substantial failures reflect Defendant County's policies implicitly ratifying and/or authorizing the use of excessive force by its sheriff's deputies and the failure to reasonably train sheriff's deputies employed by Defendant County in compliance with the Americans with Disabilities Act in making arrests, detentions, or conducting 5150's[1].

The shooting and killing of Decedent Eloy Gonzalez, JR. described herein was brutal, malicious, and done without just provocation or cause, proximately causing Plaintiffs' injuries and resulting damages.

## ARGUMENT

### A.    Legal Standards

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

---

[1] Plaintiffs note that the County recently released its officer-involved shooting review of the subject-incident, which claimed the defendants were justified in shooting and killing Mr. Gonzalez. The County's report, prepared by its own District Attorney, misstates the law and the facts of the case as demonstrated by video of the incident to reach its self-serving conclusion.  .

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (internal citation omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

In deciding a summary judgment motion, this Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment...." *Anderson*, 477 U.S. at 255. If the non-moving party's version of the facts is contradicted by the record to the point that a reasonable jury would not believe it, the court should not adopt the nonmoving party's narrative in ruling on a motion for summary judgment. See *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Service, Inc.*, 809 F.2d at 630 (internal citation omitted). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita*, 475 U.S. at 587 (citation and internal quotation marks omitted).

**B.    The Deputies' Use of Deadly Force was Unreasonable**

Plaintiffs maintain that the extent of the imminent threat Mr. Gonzalez posed to the deputies is a question of fact that turns on several different facts in dispute (e.g., whether Gonzalez reasonably complied with the deputies initial commands; whether reasonable alternatives of subduing Mr. Gonzalez were given meaningful use; whether the deputies could have eliminated the threat by moving away from him.)  However, the remaining factors—supported by undisputed

evidence and the Defendants' admissions—reveal that the deputies' use of deadly force on Mr. Gonzalez was unreasonable and this Court should find that these factors favor Plaintiff.

### 1. *Legal Standards*

In evaluating a Fourth Amendment excessive force claim, the jury asks "whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them." *Longoria v. Pinal County*, 873 F.3d 699, 705 (9th Cir. 2017). To determine whether the use of force was objectively reasonable, this Court must balance the "nature and quality of the intrusion" against the "countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The three primary factors in assessing the government interests are, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

### 2. *Nature of the Intrusion*

Here, the deputies used deadly force—the greatest degree of force—on Mr. Gonzalez. "The intrusiveness of a seizure by means of deadly force is unmatched. The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). The remaining issue is whether the governmental interests at stake were sufficient to justify their use of deadly force.

### 3. *Governmental Interests*

This Court must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case.'" *Bryan*, 630 F.3d at 826. (internal citation omitted).

### 4. *Mr. Gonzalez did not Commit a Crime and was Not Actively Resisting Arrest or Attempting to Flee*

The deputies responded to a call for an alarm for a suspected trespasser at a business park building. When they arrived at the scene, it was clear Mr. Gonzalez was sleeping on cardboard

outside of a building, and not attempting to trespass, or break into the building. (Clark Expert Report, pg. 3). It was also clear to the officers by Gonzalez's behavior that Gonzalez suffered from some form of mental impairment. For example, Mr. Gonzalez claimed that his father owned the building. (Sierra BWC, 06:47; Clark Expert Report, pg. 18). However, the deputies insisted on arresting Gonzalez when he failed to move from his sleeping spot. (Coffman Depo, 44, 45:10, 45:19-24). When Deputies first detained Mr. Gonzalez, he followed their orders, including putting his hands up when asked to do so. Gonzalez did not actively resist, or attempt to flee from the deputies. Nor was he a threat to anybody. At most, deputies suspected that Gonzalez had set off an alarm, and passively resisted arrest by refusing to come out of his sleeping area. (Silva Depo, 71:3-72:3; 75:15-76:5; Lewis Depo, 40:11-42:22. Coffman Depo, 36-38; Gomez Depo, 23:1-18; Condit Depo, 39-40; Letras Depo, 55-56; DeCroix Depo, 36; Sierra BWC, 06:08-06:30). However, Deputy Gomez, at the direction of Deputy Lewis, then unreasonably shot Mr. Gonzalez with a 40mm less lethal impact round while he was, at most, passively resisting their commands to come closer to the deputies. [2] *See also Lowry v City of San Diego* 858 F.3d 1248, 1258 (9th Cir. 2017) quoting *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (*finding that "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.*") Deputy Lewis then released a police canine, which bit and latched on to Gonzalez. (Lewis BWC, 14:17; Lewis Depo, 32:10-15, 34:9-13). On the video it looks like Gonzalez attempted to pet the dog and it sounds like Deputy Lewis shouts, "Don't 'pet' my dog!" This fact is disputed, because it is unclear on the body camera footage. Deputy Lewis states that he was shouting, "Don't 'punch' my dog!"

### 5. Whether Mr. Gonzalez Posed a Threat is a Question for the Jury

The most important factor is whether Mr. Gonzalez posed an immediate threat to the safety of officers or others. See *Longoria*, 873 F.3d at 705 (9th Cir. 2017). Material fact questions preclude summary judgment on whether Mr. Gonzalez posed an immediate threat.

Here, deputies' body worn camera videos show that Gonzalez was attempting to comply with the deputies' orders before they escalated their use of force against him. Defendants claim that they

---

[2] It is further not disputed that Gonzalez responded to the deputies' commands for him to come out from between the bush and the building by telling officers to take the dog away. A reasonable jury may find that Gonzalez passively resisted walking toward the officers for fear of being attacked by the dog, particularly considering the dog did end up biting and latching onto Gonzalez without Gonzalez having made any other provocative actions.

did not know what Gonzalez's intentions were. (Lewis Depo, 41:23-24). However, they all readily admitted in their depositions that Gonzalez did not pose a threat up, was not fleeing, and was not suspected of any significant crime until the point that they shot by the beanbag, and let the dog attack him. (Silva Depo, 71:3-72:3; 75:15-76:5; Lewis Depo, 40:11-42:22. Coffman Depo, 36-38; Gomez Depo, 23:1-18; Condit Depo, 39-40; Letras Depo, 55-56; DeCroix Depo, 36; Sierra BWC, 06:08-06:30). Lewis, who was in command and gave the instruction for Gomez to fire the beanbag round, even admitted that he believed Gonzalez was merely "passively resistive" when they shot him with the beanbag. (Lewis Depo, 33:19-34:1, 41:23-24;). However, passive resistance clearly does not give the deputies reason to shoot Mr. Gonzalez, as has been recognized by the Ninth Circuit as well. See e.g., *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) (finding it was not reasonable to shoot Deorle, a mentally disturbed man, with a less lethal beanbag in the face just because he was walking in the direction of the officer at a steady gait with a bottle in hand); *See also, Blankenhorn v. City of Orange, 485 F.3d 463, 479 (9th Cir. 2007))*.

Many of the deputies admitted in their depositions that Mr. Gonzalez was not a threat all the way up until after he was shot with the beanbag, attacked by the dog, and punch by Deputy Lewis. Until that point, the most the officers even suspected of Gonzalez was that he had perhaps accidentally set off a silent alarm, and that he refused to move from his spot. A reasonable officer would have known that Gonzalez was merely trying to sleep near the building and bush for some privacy, and protection form the elements. (Clark Expert Report, pg. 3). Further, a reasonable deputy would have realized that Gonzalez did not move from his spot because he feared the police dog, as can be seen in the videos when Gonzalez asks the deputies to take away the dog in response to them telling him to come out. (Lewis BWC, 00:55-01:10).

### 6. The Other Factors Favor Plaintiffs

The *Graham* factors are not exclusive. Other relevant factors include the availability of less intrusive alternatives to the force used, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed. See *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017).

### 7. Less Intrusive Alternatives

Although officers are not required to use the least intrusive degree of force available, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider," *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citation omitted). The clear availability of less intrusive alternatives "militate[s] against" a finding that the force used was constitutionally reasonable. *Glenn*, 673 F.3d at 876, 878.

Here, the officers should have considered less intrusive tactics such as redeployment and de-escalation. The officers were outside, and separated from Mr. Gonzalez by a bush such that they could have repositioned and created distance between themselves and Mr. Gonzalez. The Ninth Circuit has long held that in situations such as this where the suspect has not harmed anyone, less lethal is en route, and there is a possibility to retreat, the use of deadly force is unreasonable. See *Deorle*, 272 F.3d at 1282. See also, *Winkler v. City of Phoenix*, 849 Fed. App'x. 664 (9th Cir. 2021) (finding an officer's failure to use alternative tactics such as de-escalation could permit an inference that the force used was unnecessary).

### 8. *Apparent Mental Disturbance*

Mr. Gonzalez was experiencing mental health issues. When the deputies arrived, Mr. Gonzalez made multiple statement that did not make sense. Multiple deputies knew that Gonzalez could have been mentally impaired. (Letras Depo 56; Gomez Depo 27:7-18, 52:25 - 53:7). And in fact, Gonzalez was mentally impaired, having been previously diagnosed with psychosis. Some of his symptoms of psychosis included disorganized thoughts and speech, delusions, including paranoia, and hallucinations. This could be seen the night of the incident, as Gonzalez made multiple incoherent statements. (Sierra BWC, 06:47).

Courts have long recognized that "the governmental interest in using [deadly] force is diminished" if the suspect has not committed a serious crime but merely shows signs of mental illness or emotional distress. *Deorle*, 272 F.3d at 1283 ("Even when an emotionally disturbed individual is 'acting out'…, the governmental interest in using [deadly] force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."); *Vos*, 892 F.3d at 1034 (finding Vos's indications of mental illness—e.g., acting out, and at times inviting officers to use deadly force on him—created a

genuine issue of material fact about whether the government's interest in using deadly force was diminished); *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078 (9th Cir. 2019) ("[a]lthough we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, our precedent establishes that if officers believe a suspect is mentally ill, they should make a greater effort to take control of the situation through less intrusive means." (internal quotation marks omitted)).

In spite of the fact that the officers were called because Mr. Gonzalez was merely sleeping too close to a building, and clearly experiencing diminished mental capacity, the officers did nothing to take his mental health into consideration. Instead, they confronted him and demanded compliance at the point of using a less lethal 40mm projectile round, and releasing a canine to bite him. Then as Mr. Gonzalez attempted to, at most, protect himself from the police dog biting him, the deputies stood their ground even though they were able to move around the space that was available to them. Further, the deputies then shot Gonzalez as he struggled to protect himself from the canine, and punches from Deputy Lewis.

Thus, balancing all of these considerations, a reasonable jury could find that "the force employed was greater than is reasonable under the circumstances." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (internal quotation marks and citation omitted).

### 11.    *Right of Resistance to Excessive Force*

"A person has the 'limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic. That right is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007) quoting *United States v. Span*, 970 F.2d 573, 580 (9th Cir.1992) (citation omitted); *see also Arpin*, 261 F.3d at 921; *Boarman v City of Sacramento* 55 F. Supp. 3d 1271, 1286 (E.D. Cal. 2014).

"Thus, we must ask whether a reasonable jury could conclude, viewing the evidence in the light most favorable to [Plaintiff], that the Defendant officers acted in bad faith or engaged in

"provocative" conduct when arresting him. If so, and [Plaintiff's] resistance was reasonable, a constitutional violation occurred."

In *Blankenhorn,* the Court found that a person has a right to protect themselves from a law enforcements officers' bad faith conduct. Like in the instant matter, officers only suspected Blankenhorn of, at most, trespassing and passively resisting arrest. Officers subsequently violently tackled Blankenhorn, to which Blankenhorn responded to by further resisting the officers. Here, like in *Blankenhorn*, deputies only suspected Gonzalez of passively resisting arrest. (Lewis Depo, 41:23-24). Also like in *Blankenhorn*, the deputies used this as a basis for using force against Gonzalez. (Id). In *Blankenhorn*, the officers rushed Mr. Blankenhorn, and delivered punches. Blankenhorn responded with a comparable, and reasonable level of resistance.

Here, unlike in *Blankenhorn*, the force that the deputies used was much more significant. In the instant matter, the deputies shot Mr. Gonzalez with a 40mm less lethal weapon, then allowed a police canine to viciously bite and latch onto him. Gonzalez responded with reasonable force by trying to get the dog off of him. (Lewis BWC, 14:17; Lewis Depo, 34:9-13; Coffman Depo, 26, 40). At the same time, Deputy Lewis began punching Gonzalez in the face. (Lewis BWC, 14:23; Lewis Depo, 48:11-13, 49:1-9). Until this moment, Deputies had only suspected Gonzalez of potentially trespassing, and passively resisting arrest. He had not committed any serious crimes, posed any threats, or attempted to flee. (Silva Depo, 71:3-72:3; 75:15-76:5; Lewis Depo, 40:11-42:22. Coffman Depo, 36-38; Gomez Depo, 23:1-18; Condit Depo, 39-40; Letras Depo, 55-56; DeCroix Depo, 36).

Therefore, a reasonable jury could find that the deputies' actions were in bad faith and provocative when they shot Gonzalez with the beanbag, and allowed the dog to latch onto him, thereby opening the door to Gonzalez using reasonable force to protect himself, which may include the use of a tool for self-protection.

## C.    The Deputies Are Not Entitled to Qualified Immunity

Government officials are immune "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has established a two-step inquiry for determining whether qualified immunity applies. *Saucier v. Katz*,

533 U.S. 194, 201 (2001). First, a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id*. Second, if the answer to the first inquiry is 'yes,' the court must ask whether the constitutional right was "clearly established." *Id*. This second inquiry is to be undertaken in the specific context of the case. *Id*.

In determining whether a right was clearly established, it is not necessary to identify a case that it is "directly on point;" generally, the plaintiff needs to identify where an officer acting under similar circumstances was held to have violated a federal right. *Wesby*, 138 U.S. at 589-90. The Supreme Court has repeatedly stated that a prior opinion with the same facts is not necessary to clearly establish the law. *Hope v. Pelzer*, 536 U.S. 730 (2002); *Taylor v. Riojas*, 141 S.Ct. 52 (2020). Indeed, the qualified immunity analysis should be more than "a scavenger hunt for prior cases with precisely the same facts." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

### 1. *Viewing the Facts Favorable to Plaintiffs, the Right at Issue is Clearly Established*

*Deorle* is instructive. Deorle was clearly emotionally disturbed and attempting to commit suicide-by-cop. Deorle had not attacked anyone. The shooting officer failed to warn Deorle and he could "easily have avoided a confrontation by retreating." *Deorle*, 272 F.3d at 1282. The *Deorle* Court found it was not reasonable to shoot him because he was walking in the direction of the officer at a steady gait with a bottle in his hand. *Id*. at 1284. As of 2001, the Ninth Circuit has held that deadly force on emotionally disturbed subject that has not harmed anyone else and is goading the police into a confrontation is objectively unreasonable because the officer did not consider other less intrusive available tactics such as retreat, de-escalation and failed to give a warning prior to using deadly force. *Id*. at pp. 12182-1283.

*Vos* is also instructive. In *Vos*, officers were called to the scene because of Vos's erratic behavior, not to respond to a crime, Vos had a little opportunity to flee, he was not resisting arrest, and the officers did not attempt to communicate with him or give him any commands. *Id*., 892 F.3d at 1031. Even though Vos ran at the officers with an edged weapon in his hand, the Court found that questions of fact regarding whether he was an immediate threat precluded summary judgment and found that a jury could find a constitutional violation. *Vos*, 892 F.3d at 1034-36. *Vos* was decided in

June 2018, meaning as of September 2020 the deputies' conduct here could amount to a constitutional violation for which they are not entitled to qualified immunity.

Moreover, the Ninth Circuit has long held that mere possession of a weapon is not sufficient to justify the use of deadly force, "otherwise, that a person was armed would always end the inquiry." See e.g., *Glenn*, 673 F.3d at 872; *Roderick,* 126 F.3d at 1204 ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed"); *George v. Morris*, 736 F.3d at 838 (finding where the decedent was acting erratically and had a gun but did not point it at the officers, clearly establishes that officers cannot shoot and kill a person without warning and without objective provocation); *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1233-34 (9th Cir. 2013) (reversing a district court's grant of summary judgment where a victim approached officers while armed with a knife, but where the suspect "was not charging them," "had not been ordered to stop," "was given no warning," and was not witnessed acting erratically with the weapon); *Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-25 (9th Cir. 1991) (rejecting summary judgment where the suspect had a gun, but where the suspect was not pointing it at the officers, and was not directly facing the officer who opened fire).

### 2.  Fact Questions Preclude Deciding Qualified Immunity on Summary Judgment

The Ninth Circuit has repeatedly recognized that excessive force cases often turn on credibility determinations, and that the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Where, as here, facts relevant to the reasonableness of force used are disputed, the case cannot be resolved at summary judgment on qualified immunity grounds. See *Glenn*, 673 F.3d at 870 ("We express no opinion as to the second part of the qualified immunity analysis and remand that issue to the district court for resolution after the material factual disputes have been determined by the jury."); *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming a denial of summary judgment on qualified immunity grounds because there were genuine issues of fact regarding whether the officers violated plaintiff's Fourth Amendment rights, which were also material to a proper determination of the reasonableness of the

officers' belief in the legality of their actions); *Santos*, 287 F.3d at 855 n.12 (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom").

Here again, the deputies tell different stories about the manner in which Mr. Gonzalez allegedly resisted arrest. It is undisputed that if Mr. Gonzalez was merely attempting to defend himself against the dog, he was less of a threat and the deputies had an opportunity to transition to lesser lethal options.

Defendants argue that Gonzalez was swinging an axe at them at the time they shot him. Silva Depo, 84:14-22; . However, the physical and video evidence indicate that Deputies Lewis and Silva shot Mr. Gonzalez while Mr. Gonzalez was, at most, attempting to defend himself form the biting dog. (Lewis BWC, 14:17; Lewis Depo, 34:9-13; Coffman Depo, 26, 40). Plaintiffs assert that Deputies Lewis and Silva only shot Mr. Gonzalez in an attempt to get Gonzalez to stop fighting the dog. (Lewis Depo, 49). Which, as is also shown and undisputed, Mr. Gonzalez had his hands up and was not actively resisting when the deputies released the dog in the first place. (Silva BWC, 14:16; Lewis Depo, 26:5-12, 32:5-9, 37:8-12, 41:23-24). It is further undisputed that Mr. Gonzalez was suffering from a mental health disability. (Gonzalez Medical Records, pg. 3). Based on these facts, viewed in Plaintiffs' favor, the deputies are not entitled to qualified immunity.

Thus, qualified immunity is not a proper ground for summary judgment here.

**D.    Fourteenth Amendment**

Family members may assert a "Fourteenth Amendment claim based on the related deprivation of their liberty interest arising out of their relationship with" a decedent, separate from a survival action for Fourth Amendment violations. Moreland, 159 F.3d at 371. "This substantive due process claim may be asserted by [] the [spouse,] parents and children of a person killed by law enforcement officers." Moreland, 159 F.3d at 371. The Fourteenth Amendment's substantive due process clause protects against "government power arbitrarily and oppressively exercised." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th

Cir. 2008) (citation omitted). This Court's "inquiry begins by asking 'whether the circumstances are such that actual deliberation' by [the officer] before [their] use of force was 'practical.'" *Tan Lam v. Acosta*, 18-17404 (2000) (citing *Porter,* 546 f.3d at 1137). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. *Id*. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id*. at 1140.

A police officer cannot create the escalation that then justifies the use deadly force. See *Porter*, 546 F.3d at 1141 ("[w]hen an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation.") Moreover, the officers admit that they did not consider Mr. Gonzalez's mental health in their uses of force against him. (Lewis Depo, 65:3-15; Silva Depo, 69:3-13, 92:4-10; Coffman Depo, 18:3-17, 32:4-11). A jury may well determine that the deputies were deliberately indifferent about saving Mr. Gonzalez's life if they did not even factor his mental health into their approach to him.

Thus, at the very least, "there is evidence to support both standards [shocks the conscience and purpose to harm], and the determination should be left to the jury." *Greer v. City of Hayward*, 229 F.Supp.3d 1091, 1108 (N.D. Cal. 2017).

**E.      State Law Claims**

Defendants argue that because the deputies acted reasonably under federal law then their conduct is also lawful under state law. Plaintiffs maintain that the same material factual disputes that preclude summary judgment in Defendants' favor on their Section 1983 claims, also precludes summary judgment on their state law claims.

**1.      Negligence**

In California, police officers "have a duty to act reasonably when using deadly force." *Hayes v. County of San Diego*, 57 Cal. 4th 622, 629 (2013). To prevail on a negligence theory, Plaintiffs must show that the officers "had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Id*. "The reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Id*. California's totality-of-

the-circumstances inquiry includes pre-shooting circumstances and thus "is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id*. at 639; accord *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016) ("[N]egligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment."); *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 n.6 (9th Cir. 2016) (noting that "state negligence law . . . is broader than federal Fourth Amendment law") (quoting Hayes I, 305 P.3d at 263).

Here, the deputies failed to develop a tactical plan, did not gather any information about Mr. Gonzalez or the situation, and rushed at Mr. Gonzalez with weapons drawn, barking commands, and failed to attempt any de-escalation techniques. A jury may well determine that Defendants' were negligent in their use of force. *Hayes v. County of San Diego*, 736 F.3d 1223, 1235-1236 (reversing grant of summary judgment where officers shot a suicidal suspect holding a knife over his head within 6 to 8 feet of the officers when the officers failed to warn the suspect or attempt any de-escalation tactics); see also, *Grudt v. City of Los Angeles*, 2 Cal.3d 575, (finding that the totality of the circumstances, including the preshooting conduct of the officers, might persuade a jury to find the shooting negligent and that preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable).

## 2. Remaining State Law Claims

"A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009). And The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation or coercion." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citing Venegas v. County of Los Angeles, 153 Cal.App.4th 1230, 63 Cal. Rptr. 3d 741 (2007)) (internal quotations omitted). The Ninth Circuit has held that the elements (except for specific intent) of an excessive force claim under § 52.1 are the same as under § 1983. See *Chaudry*, 751 F.3d at 1105; see also, Reese, 888 F.3d at 1042.

Here again, the same material fact questions that preclude summary judgment on whether Mr. Gonzalez posed an imminent threat to the officers also precludes summary judgment on Plaintiffs' battery and Bane Act claims.

### 3. No State Law Immunities

Defendants also claim that state immunities Gov't Code §§ 815.2, 820.2, 820.8, Cal. Penal Code § 835(a) should apply. Not so. "California cases have consistently held that a peace officer making an arrest is liable to the person arrested for using unreasonable force" and Gov't Code §§ 815.2, 820.2, or Cal. Penal Code § 835(a) will not apply. *See Scruggs v. Haynes*, 252 Cal. App. 2d 256, 264 (1967). In *Scruggs*, only state claims were at issue and the appellate court explained that since the trial court found the officers used unreasonable force state immunities did not apply.

Moreover, Gov't Code §820.8 it explicitly states that "[n]othing in this section exonerates a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission." Here, Defendants are liable for their unreasonable force and their integral participation in the force.

### CONCLUSION

Pursuant to Rule 56, Plaintiffs move that this Court rule that defendants used excessive force on decedent Gonzalez in violation of 42 U.S.C 1983 and in doing so violated his Constitutional rights. Furthermore, plaintiffs request that this Court find that the defendant deputies' action were not protected by the Qualified Immunity Doctrine.

Dated: May 17, 2023                 **THE LAW OFFICES OF JOHN L. BURRIS**

/s/ *James Cook*
Ben Nisenbaum, Esq.
James Cook
Attorney for Plaintiffs
MARIA GONZALEZ, et al.