1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Maria Teresa Gonzalez, individually and H.G.,        No. 1:21-cv-01091-KJM-CSK
      a minor, by and through her guardian ad litem
12    Lillian Tegio,                                        ORDER

13                          Plaintiffs,

14           v.

15    County of Stanislaus, et al.,

16                          Defendants.

17

18           The parties seek summary judgment or partial summary judgment in this case involving

19    the death of Eloy Gonzalez, Jr. in a confrontation with Stanislaus County Sheriff's Deputies in

20    2020.  As explained in this order, genuine disputes of material fact prevent the court from

21    deciding as a matter of law whether either party is entitled to judgment on plaintiffs' third claim

22    for negligence and wrongful death.  Defendants have otherwise shown either that they are entitled

23    to qualified immunity or that plaintiffs did not present their claims as required by the California

24    Government Claims Act.  Plaintiffs' motion is therefore **denied**, and defendants' motion is

25    **granted in part**.

26    I.     EVIDENCE

27           The court has reviewed the parties' respective statements of fact and the underlying

28    record.  *See* Pls.' Opp'n to Defs.' Statement of Undisputed Facts (Pls.' Opp'n SUMF), ECF

1

No. 41-1; Defs.' Resp. to Pls.' Statement of Undisputed Facts (Defs.' Opp'n SUMF), ECF No. 42-1.  The evidence shows as follows.

Early in the morning of September 27, 2020, a few minutes before 5:00 a.m., Stanislaus County Sheriff's Deputies Michael Sierra and Steven Noel responded to a silent alarm at a warehouse in Modesto, California.  Sierra Decl. ¶¶ 2–3, ECF No. 34-3.  The two deputies understood from their dispatcher that an alarm company had "reported loud taps from the southwest end of the warehouse."  *Id.* ¶ 3.  They drove around the building and saw no signs of a break-in or burglary.  *Id.* ¶ 4.  They parked their patrol car and got out.  *Id.* ¶ 5.  Sierra turned on his body camera.  *Id.* ¶ 14; *see also id.* Ex. A (recorded video).  The video shows the morning was still dark, the building illuminated dimly and intermittently by streetlamps.  *Id.* ¶ 7 & Ex. A at 0:26–1:00.

As Sierra and Noel walked along the south side of the building, Sierra heard a voice call out from behind a bush, "Hey, what's up, man?"  *See id.* ¶¶ 8–9 & Ex. A at 1:00–1:03.  Sierra quickly drew his handgun, turned on the attached flashlight, and raised it, pointing it toward the voice he had heard.  *See id.* ¶¶ 10–11 & Ex. A at 1:03–1:05.  The light illuminated a man standing near the building behind a bush, which concealed most of his lower body: it was the decedent, Eloy Gonzalez, Jr.  *Id.*  His back was to the building.  *Id.*  His left hand was at his side, visible, holding something round; his right hand was not visible.  *Id.* Ex. A at 1:00–05.

The deputies both called out to Gonzalez, their voices quickly rising to shouts: "Hands! Hands!  Hands!  Hands!  Get your hands up!  Show me your fucking hands!"  *Id.* Ex. A at 1:03–1:10.  Gonzalez did not show his hands, but instead bent down.  *See id.* Ex. A at 1:03–1:10.  Sierra holstered his gun as he spoke and raised a taser in its place.  *See id.* ¶ 12 & Ex. A at 1:05–1:08.  As he did, both he and Noel continued shouting: "You're gonna get tazed!  Show me your fucking hands, now!  Get your fucking hands up!"  *Id.* at 1:08–1:14.

Sierra moved forward and to his right, circling Gonzalez until he had an unobstructed view of him behind the bush.  *See id.* ¶ 13 & Ex. A at 1:10–1:20.  Gonzalez, meanwhile, had raised his hands, then lowered them again, and asked the officers why they were threatening to taze him; he told them the building was his "property."  *Id.* Ex. A at 1:10–1:30.  As the deputies

2

1 continued shouting instructions to Gonzalez to show his hands, he raised them again. *See id.* at

2 1:20–1:25. "This is my fucking property, man," he repeated, then: "Get the hell outta here." *Id.*

3 at 1:20–1:25. Despite his aggressive language, he did not raise his voice or shout. *See id.*

4   At this point, only about thirty seconds had passed since the deputies first saw Gonzalez.

5 Sierra reported over his radio that he and Noel had found an "uncooperative on the south side of

6 the building." *Id.* at 1:25–1:30. Meanwhile, Gonzalez continued speaking, and the deputies

7 continued ordering him to keep his hands in the air. *See id.* "I'm sitting down," he eventually

8 said. *Id.* at 1:28–1:31. "My dad, my dad's a senator." *Id.* at 1:28–38. The deputies told

9 Gonzalez to "walk out" from where he was and warned him more deputies were on their way.

10 *See id.* at 1:40–2:20. As they spoke, their tone began to mellow. "I'm gonna tell you," Sierra

11 said, "This is gonna be your last opportunity, bud." 1:55–2:01. Gonzalez's answers were not

12 entirely coherent. "I know this is the last opportunity," he responded. "I know how this works.

13 But my father, my father's the man. So if you're gonna send me where he's at, then so be it, you

14 know what I mean, but I'm sitting down because this is all I got." *Id.* at 2:01–2:15. He soon sat

15 down, shielded his eyes with his hands and hat, and asked the deputies to stop shining their

16 flashlights in his face. *See id.* at 2:15–2:30.

17   The three men spoke for the next several minutes. Sierra explained to Gonzalez that the

18 two deputies were investigating an alarm call but could not continue because Gonzalez was not

19 doing as they had instructed. *See id.* at 2:30–7:45. Sierra warned him he would be placed under

20 arrest, then told him he was in fact under arrest, and said a K9 unit was on the way. *See id.*

21 Gonzalez tried to persuade the deputies to leave him alone. *See id.* He told them he knew

22 "Dirkse" and "Christianson," the current and former Sheriff, respectively. *See id.*

23   About seven minutes later, several other deputies arrived together, including Chad Lewis

24 and Brandon Silva, both K9 officers. *See id.* at 7:30–8:00; Lewis Decl. ¶ 3, ECF No. 34-4; Silva

25 Decl. ¶ 6, ECF No. 34-5. Both Lewis and Silva were wearing body cameras, and both cameras

26 were recording. *See* Lewis Decl. ¶ 4 & Ex. A; Silva Decl. ¶ 5 & Ex. A. Lewis and Silva had

27 heard Sierra's report that Gonzalez was uncooperative and had not followed instructions to come

1    out or lie on the ground. *See* Lewis Decl. ¶ 7; Silva Decl. ¶¶ 3, 8. Lewis brought his dog with

2    him. Lewis Decl. ¶ 6. Silva did not, as Lewis had already done so. *See* Silva Decl. ¶ 6.

3         Lewis moved toward Gonzalez with his dog, ordering Gonzalez repeatedly to lie on the

4    ground on his stomach or the dog would bite him. *See* Lewis Decl. Ex. A at 0:00–1:00. Silva

5    moved closer to Gonzalez as well. *See* Silva Decl. Ex. A at 0:45–1:00. He told the other deputies

6    he thought he saw a knife beneath a bucket at Gonzalez's side, as well as a "rod" of some kind

7    nearby. *See id.* Sierra Ex. A at 8:40–9:00; Silva Decl. ¶ 10 & Ex. A at 1:25–1:45. An

8    unidentified deputy also said he saw "some kind of tool." Sierra Decl. Ex. A at 8:58–9:01. The

9    deputies aimed their lights and a laser where they thought the knife was hidden. *Id.* at 8:45–8:50.

10   The court's independent review of the video shows something silver—and unidentifiable—that

11   appears mostly hidden beneath a bucket to Gonzalez's left. *See id.*

12        As the officers and dog moved closer, Gonzalez told them they would not be doing their

13   job if the dog attacked him, and he told them to take the dog away. Lewis Decl. Ex. A at 0:35–

14   1:05; Coffman Dep. at 34, ECF No. 39-11. Although he ignored the officers' repeated

15   instructions, he sat still and held his hands in the air in front of him. Sierra Decl. Ex. A at 8:00–

16   9:10; Perez Dep. at 34, ECF No. 39-13. He did not threaten the officers or anyone else, and he

17   did not flee or attempt to flee. *See* Lewis Dep. at 40–42, ECF No. 39-9; Silva Dep. at 71–76,

18   ECF No. 39-10; Coffman Dep. at 48; Gomez Dep. at 52, ECF No. 39-12; Perez Dep. at 51;

19   Condit Dep. at 40, ECF No. 39-14; DeCroix Dep. at 36, ECF No. 39-16.

20        Silva suggested someone fire a "less lethal beanbag"[1] at Gonzalez to "soften him up."

21   Gomez Dep. at 49; Lewis Decl. Ex. A at 1:05-1:10; Silva Decl. Ex. A at 1:52–1:56; Silva Dep. at

22   84. A deputy followed his suggestion, and the shot hit Gonzalez in the upper left rib. *See* Lewis

---

[1] "A beanbag shotgun is 'a twelve-gauge shotgun loaded with beanbag rounds,' which consist of 'lead shot contained in a cloth sack.' It is 'intended to induce compliance by causing sudden, debilitating, localized pain, similar to a hard punch or baton strike.' 'Although bean bag guns are not designed to cause serious injury or death, a bean bag gun is considered a less-lethal weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or death' 'if they hit a relatively sensitive area of the body, such as the eyes, throat, temple or groin.'" *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (alterations omitted) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1277 (9th Cir. 2001)).

1  Decl. Ex. A at 1:08–1:15.  He flinched and doubled over.  *Id.*  Lewis and the dog moved in

2  immediately.  *See id.*  Lewis ordered the dog to attack, to bite Gonzalez, to hold the bite, and to

3  drag him backward out from behind the bush.  *See* Lewis Decl. ¶ 10 & Ex. A at 1:05–1:15; Lewis

4  Dep. at 26.

5         From this point on, the video recorded by the officers' body cameras is frequently

6  obstructed, choppy and blurry.  It is more much difficult to interpret.  The video recorded by

7  Lewis's camera shows the dog biting Gonzalez's leg as Gonzalez fights back, striking at the dog

8  with his hands while Lewis shouted not to "fight my dog" and "get on the ground."  *See* Lewis

9  Decl. Ex. A at 1:10–1:19.  Lewis avers in his declaration that Gonzalez had grabbed the dog's

10 neck and lifted his front feet off the ground, preventing him from pulling Gonzalez out from

11 where he sat.  *Id.* ¶ 11.  Lewis says he also thought Gonzalez was choking the dog.  *Id.*  He

12 dropped the dog's leash and began striking at Gonzalez with his fists.  *See id.* ¶ 12.  It is unclear

13 from the video whether Gonzalez struck back at Lewis or attempted to do so.  After a few

14 seconds, however, Lewis shouted and stood up; he states in his current declaration that he saw a

15 "hatchet," but shouted the word "axe" because the word "hatchet" did not immediately come to

16 him.  *Id.* ¶¶ 13–14 & Ex. A at 1:19–1:22; Lewis Dep. at 28.  It is difficult, if not impossible, to

17 see an axe in the video, let alone what Gonzalez did with it.  *See id.* at 1:20–1:21.  Defense

18 counsel has submitted still frames from the video that confirm the body camera captured images

19 of an axe.  *See* Motooka Decl. Exs. H & I, ECF No. 34-7.  Plaintiffs do not currently dispute that

20 Gonzalez had an axe.  *See, e.g.*, Pls. Mem. at 2, ECF No. 39-1 (conceding Gonzalez had an axe in

21 his hand).  The video then shows Lewis pulling back, drawing his handgun, standing over

22 Gonzalez, and firing three shots at close range toward Gonzalez's head and chest.  *See* Lewis

23 Decl. Ex. A at 1:20–1:25; Lewis Dep. at 28, 32–34, 50–51.

24        Silva had moved in close to Lewis and Gonzalez as they struggled.  *See* Lewis Decl. Ex.

25 A at 1:20–1:25.  He also fired—one shot—at Gonzalez.  *See id.*; *see also* Silva Dep. at 66.  In

26 total, about thirty seconds had passed since the officers fired the "beanbag" shotgun.  Silva Dep.

27 at 66.

1      The video from Silva's camera shows Lewis as he moved in with the dog and made his

2   unsuccessful attempt to drag Gonzalez out from behind the bush.  *See* Silva Decl. Ex. A at 2:01–

3   2:10.  It is not possible to see an axe in the video recorded by Silva's camera, nor what Gonzalez

4   did with it, if anything.  *Id.* at 2:09–2:12.  But again, defense counsel has attached still frames

5   from that video to her declaration showing an axe, Motooka Decl. Exs. J–L, and as noted,

6   plaintiffs do not dispute Gonzalez had an axe in his hand, Pls.' Mem. at 2.

7      Finally, Sierra's body camera did not capture Lewis and the dog as they moved toward

8   Gonzalez after the beanbag shot.  Sierra's hands and another deputy's body fill the frame during

9   that part of the confrontation.  *See* Sierra Decl. Ex. A at 9:10–9:20.  After a few seconds, Lewis

10  comes into view as he was standing above Gonzalez, striking him, shouting at him not to fight his

11  dog, and finally shooting him.  *Id.* at 9:20–9:25.  No axe is visible in the video, but officers did

12  recover the weapon and they say they confirmed it was an axe.  *See* Silva Decl. ¶¶ 19–20.

13     Gonzalez suffered multiple gunshot wounds and later died at the hospital.  Clark Expert

14  Report, Ex. 13 to Pls.' MSJ, ECF No. 39-17; Pls.' Opp'n SUMF No. 81.  Both Deputy Lewis and

15  Deputy Silva sustained small abrasions on their lower legs during the encounter.  Lewis Decl.

16  ¶ 17; Silva Decl. ¶ 21.  Lewis's pinky finger was also broken and had a torn ligament.  Lewis

17  Dep. at 29.  The record does not show what caused the officers' injuries.  The police dog was not

18  injured.  Lewis Decl. ¶ 16.

19     Medical records from 2017—about three years before the encounter—could potentially

20  show at trial that Gonzalez was suffering from the acute or chronic symptoms of drug or alcohol

21  addiction and psychoses when the deputies found him.  *See* Pls.' Mem. Ex. 14, ECF No. 39-18.

22  But at the moment, without more context and foundation, it is not possible to interpret those

23  records with confidence, nor to draw firm conclusions from them about Gonzalez's mental health

24  at the time of his death.

25  **II.    PROCEDURAL BACKGROUND**

26     Gonzalez's mother and minor daughter, H.G., filed this action against the County of

27  Stanislaus, the sheriff, Sierra, Lewis, Silva, and several other deputies in July 2021.  *See generally*

6

Compl., ECF No. 1.  The operative first amended complaint includes five claims against Lewis

and Silva and the County under a theory of respondeat superior:

    (1)      Excessive use of deadly force under 42 U.S.C. § 1983 and the Fourth Amendment,
by H.G. as Gonzalez's successor in interest, First Am. Compl. ¶¶ 37–38, ECF
No. 15;

    (2)      Violations of rights to familial relationship under 42 U.S.C. § 1983 and the
Fourteenth Amendment, by both plaintiffs, First Am. Compl. ¶¶ 39–41;

    (3)      Wrongful death and negligence under California Code of Civil Procedure sections
377.60 and 377.61, by H.G., both individually and as Gonzalez's successor in
interest, First Am. Compl. ¶¶ 42–48;

    (4)      Violation of California Civil Code section 52.1, by H.G. as Gonzalez's successor
in interest, First Am. Compl. ¶¶ 49–55; and

    (5)      Wrongful death–battery state claim, by H.G., both individually and as Gonzalez's
successor in interest, *id.* ¶¶ 56–59.

As noted, the parties have filed cross-motions for summary judgment.  Defendants move

for summary judgment on all of plaintiffs' claims.  *See generally* Defs.' Mot., ECF No. 34.

Plaintiffs have opposed, Pls.' Opp'n, ECF No. 41, and defendants have replied, Defs.' Reply,

ECF No. 43.

Plaintiffs also move for summary judgment, *see generally* Pls.' Mot., ECF No. 39, but

rather than contending the record is undisputed, they argue genuine disputes of fact remain to be

resolved at trial: first, they argue there are genuine disputes of material fact related to their first

claim, but only as to defendants' assertion of qualified immunity, *see* Pls.' Mem. at 15–16, ECF

No. 39-1; second, they contend there are genuine disputes of material fact related to all four

remaining claims, *see id.* at 16–19.  As for plaintiff's first argument about their first claim, if

defendants used excessive force as a matter of law, and if no genuine disputes preclude that

conclusion, then the court, not a jury, would determine whether they are entitled to qualified

immunity given any relevant clearly established law.  *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224,

227–28 (1991) (per curiam).  As for the remaining claims and arguments, genuine disputes of

1 material fact would preclude summary judgment for any party. *See* Fed. R. Civ. P. 56(a). The

2 court has accordingly construed plaintiffs' cross-motion as a limited request for partial summary

3 judgment focused on their first claim of excessive force. *See id.* (permitting motions for summary

4 judgment on only "part of" a "claim or defense").

5       Defendants have opposed plaintiffs' motion, Defs.' Opp'n, ECF No. 42, and plaintiffs

6 have replied, Pls.' Reply, ECF No. 44.

7 **III.  LEGAL STANDARD**

8       A court may grant summary judgment if "there is no genuine dispute as to any material

9 fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

10 "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved

11 only by a finder of fact because they may reasonably be resolved in favor of either party," or

12 conversely "whether it is so one-sided that one party must prevail as a matter of law." *Anderson*

13 *v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986). A dispute is "genuine" if "a reasonable jury

14 could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if it "might

15 affect the outcome of the suit under the governing law." *Id.*

16       The moving party bears the initial burden of showing the district court "there is an

17 absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S.

18 317, 325 (1986). The burden then shifts to the non-movant to "establish that there is a genuine

19 issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585

20 (1986). Both parties must cite "particular parts of materials in the record." Fed. R. Civ. P.

21 56(c)(1)(A); *see also Matsushita*, 475 U.S. at 586 ("[The non-moving party] must do more than

22 simply show that there is some metaphysical doubt as to the material facts"). The court then

23 views the record in the light most favorable to the nonmoving party and draws reasonable

24 inferences in that party's favor. *Matsushita*, 475 U.S. at 587–88; *Adickes v. S.H. Kress & Co.*,

25 398 U.S. 144, 157 (1970).

26       Cross-motions for summary judgment are evaluated separately under the same standard,

27 "giving the nonmoving party in each instance the benefit of all reasonable inferences." *Am. C.L.*

28 *Union v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

1    **IV.    ANALYSIS**

2         As summarized above, plaintiffs argue they are entitled to judgment as a matter of law on

3    their excessive force claim, but for the other claims, they contend material factual disputes

4    preclude summary judgment.  Defendants, by contrast, argue there is no dispute but that the

5    deputies' force was reasonable as a matter of law, but if it was not, then they contend they are

6    protected by qualified immunity; they also argue plaintiffs could not support their remaining

7    claims at trial.  *See* Defs.' Mem. at 14–23, ECF No. 34-1.  The court analyzes these motions

8    together, taking each claim in turn.

9         **A.    Claim One: Excessive Force under § 1983**

10        Plaintiffs do not allege or contend the deputies used excessive force when they pointed

11   their weapons at Gonzalez, fired a less-lethal "beanbag" shot at him, ordered the dog to bite him

12   or struck him with their fists.  Their allegations and arguments focus exclusively on the fatal

13   gunshots.  *See, e.g.*, First Am. Compl. ¶ 28 ("Plaintiffs contend that at most less-lethal force was

14   reasonable under these circumstances, and every reasonable officer would know that lethal force

15   was unreasonable."); *id.* ¶ 38 ("Defendants . . . acted under color of law by killing Decedent

16   without lawful justification and subjecting decedent to excessive force thereby depriving Plaintiff

17   and the Decedent of certain constitutionally-protected rights . . . ."); Pls.' Mot. at 8 (limiting

18   arguments to "deadly force—the greatest degree of force").  The court therefore interprets their

19   first claim as limited to the gunshots.

20        When a person alleges officers used excessive force during an investigation or arrest,

21   including lethal force, such as the use of a handgun, courts assess the officers' actions under the

22   Fourth Amendment.  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam); *Thompson v.*

23   *Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).  There are three steps to the analysis.  First, the court

24   must consider the "type and amount of force inflicted."  *Thompson*, 885 F.3d at 586 (quoting

25   *Espinoza v. City of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)).  Second, the court must

26   assess the "government's interests."  *Id.* (quoting *Espinoza*, 598 F.3d at 537).  For example, how

27   serious was the suspected crime?  Did the suspect pose an immediate threat to the officers or

28   public?  Was the suspect resisting arrest or attempting to escape?  *See id.*  And third, the court

1   decides whether the government's interests justified the force used. *See id.* This is an objective

2   test that evaluates the officers' conduct "from the perspective of a reasonable officer on the

3   scene." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

### 1.    Nature and Quality of Intrusion

5   Defendants correctly concede the quantum of force they used was "severe." Defs.' Mem.

6   at 16. When an officer fires a weapon at a suspect, the nature and quality of the intrusion

7   amounts to lethal force. *See Blanford v. Sacramento County*, 406 F.3d 1110, 1115 n.9 (9th Cir.

8   2005) (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th Cir. 2005) (en banc)). And when

9   lethal force is used, the highest level of Fourth Amendment scrutiny is implicated "because the

10  suspect has a fundamental interest in his own life and because such force frustrates the interest of

11  the individual, and of society, in judicial determination of guilt and punishment." *Vos v. City of

12  Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (citations and internal quotations omitted).

### 2.    Government Interests

14  Where the severity of the intrusion is undisputed, as it is here, "the issue is determining

15  whether the governmental interests at stake were sufficient to justify it." *Id.* In evaluating the

16  government interests implicated, the court considers (1) the severity of the crime; (2) whether the

17  threat to the officer's or public safety was immediate; and (3) any resistance or attempts to flee or

18  escape by the suspect. *See Graham*, 490 U.S. at 396. Of these factors, "the most important is

19  whether the individual posed an immediate threat to officer or public safety." *Young v. County of

20  Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011).

21  First, with regard to the severity of the crime, deputies arrived to investigate a potential

22  burglary or trespassing, and they ultimately arrested Gonzalez, under California Penal Code

23  section 148 for obstructing their investigation. *See* Cal. Penal Code § 148(a)(1). Although

24  deputies suspected a burglary, no party has cited evidence that could show at trial that Gonzalez

25  broke into the building or attempted to do so, and the court is aware of none. Trespassing and

26  obstructing an investigation are not serious or violent crimes that might justify severe force. *See

27  Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (trespassing and obstructing

28  police officer not "serious offenses").

1      Second, as to threats of harm and public safety, no evidence shows Gonzalez posed a

2  threat to the general public.  He and the deputies were the only people at the scene.  The evidence

3  could show, however, he posed a threat to the deputies, especially to Lewis.  To be sure, that

4  threat was minimal at first.  When the deputies arrived, saw Gonzalez, and spoke to him, he posed

5  relatively little threat, or even no threat at all, neither to the deputies nor to anyone else.  He was

6  standing several feet away from them, behind a bush, with his back to a wall, and although his

7  right hand was not visible, he soon showed both of his hands and sat down.  Many more deputies

8  also soon arrived.  Although the officers were unsure whether a weapon or potentially deadly tool

9  was hidden beside Gonzalez and what the weapon or tool was, he did not reach for it.  Defendants

10  do not explain how Gonzalez's noncompliance alone threatened their own safety or the safety of

11  anyone else, and the court finds as a matter of law that it did not.

12      Later, however, after the police dog bit Gonzalez, the threat to the deputies' safety grew

13  more severe.  Gonzalez began to resist the dog's attack, possibly struck the dog and Lewis, and he

14  took hold of an axe.  Defendants claim Gonzalez posed an immediate and deadly threat to Lewis

15  at this point in the encounter.  *See* Defs.' Mot. at 16.  They portray the evidence as showing

16  beyond dispute that Gonzalez "suddenly started swinging a hatchet or hand axe towards Deputy

17  Lewis."  *See* Pls.' Opp'n SUMF ¶ 70.  The record is not so clear.  As plaintiffs correctly point

18  out, "[i]t is unclear how Gonzalez was holding the axe, or if he was actually swinging it at

19  someone."  *Id.*  The video evidence is inconclusive—both in terms of what it shows and what

20  inferences can be drawn from it.  *See Vos*, 892 F.3d at 1028 ("The mere existence of video

21  footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences

22  that can be drawn from that footage.").  Only a few blurry frames show the axe at all, let alone

23  what Gonzalez did with it, if anything, including whether he brandished it, threatened anyone

24  with it, or attempted to strike the deputies or the dog with it.  It is unclear even whether Gonzalez

25  was moving his arm voluntarily when he had the axe in his grasp.  A dog was biting him and an

26  officer was standing over him and striking him with his fists.  In short, the video shows only that

27  there was briefly an axe in his hand, not that he posed an immediate and deadly threat.

1    Gonzalez's possession of a weapon is not conclusive evidence that legal force was

2    justified.  "[T]he mere fact that a suspect possesses a weapon does not justify deadly force in and

3    of itself." *See Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) (citations

4    omitted).  In multiple previous cases, courts have held that a person holding a weapon or potential

5    weapon is not necessarily an immediate threat to nearby officers, especially when, as in this case,

6    the officers greatly outnumber that person. *See, e.g.*, *Vos*, 892 F.3d at 1032 (holding a reasonable

7    jury could conclude a person did not pose an immediate threat even though he moved toward

8    officers with something in his hand); *Hayes*, 736 F.3d at 1233 (determining a reasonable jury

9    could find a man holding a knife did not pose an immediate threat because it was unclear whether

10   he had acted in a threatening way); *cf. Deorle*, 272 F.3d at 1280–81 (denying motion for summary

11   judgment on excessive force claim where emotionally disturbed but threatening man advanced

12   toward officers carrying a bottle or can after previously brandishing an axe).  An officer's "desire

13   to resolve quickly a potentially dangerous situation is not the type of governmental interest that,

14   standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at

15   1281.  Because the record does not show beyond dispute whether Gonzalez posed an immediate

16   and deadly threat to Lewis or any other deputy, it is not possible to find as a matter of law that the

17   government's interests included an interest in responding to an immediate and deadly threat.

18       As summarized above, the third relevant factor in assessing the government's interest

19   focuses on any evidence showing Gonzalez was fleeing, attempting to flee or resisting the

20   officers.  The evidence shows beyond dispute that he was not fleeing or attempting to flee.  He

21   wanted to stay where he was, as he made clear.  No party argues otherwise.  That fact is subject to

22   no genuine dispute.  Gonzalez did, however, resist arrest, and that also is beyond dispute.  But his

23   resistance changed over time.  He was standing when the officers first saw him, but he soon sat

24   down and put his hands in the air.  Resistance is not "a binary state, with resistance being either

25   completely passive or active.  Rather, it runs the gamut from the purely passive protestor who

26   simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan v.*

27   *MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).  Gonzalez did not resist actively at first, only

28   passively.  The government has little interest in using substantial force, let alone deadly force, to

1    overcome passive noncompliance.  *See id.* at 829–30 (collecting authority showing passive

2    failures to comply are not "'active resistance' supporting a substantial use of force").  But later,

3    after the dog bit Gonzalez, he began to resist actively.  A jury could find he fought the dog and

4    Lewis.  And as the two men struggled, he picked up an axe.

5           Although it is undisputed Gonzalez was resisting in an active way immediately before the

6    deputies fired their handguns, it is for a jury to assess his level of resistance in context.  That is

7    true for two reasons.  First, as explained above, it is unclear whether Gonzalez was using the axe

8    to resist.  Second, the jury also will need to weigh Gonzalez's mental state, his confused speech,

9    his outlandish claims, and what that evidence conveyed about his resistance and practical ability

10   to comply.  *See Deorle*, 272 F.3d at 1283 ("Even when an emotionally disturbed individual is

11   'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in

12   using such force is diminished by the fact that the officers are confronted, not with a person who

13   has committed a serious crime against others, but with a mentally ill individual.").

14          Lastly, the court must consider any other factors relevant to the government's interest,

15   because "the *Graham* factors are not exclusive."  *Vos*, 892 F.3d at 1033–34.  Other factors

16   relevant here include "the availability of less intrusive force," "indications of mental illness," and

17   "whether proper warnings were given."  *Id.* (citing *Bryan*, 630 F.3d at 831; *Deorle*, 272 F.3d at

18   1282–83; *Longoria v. Pinal County*, 873 F.3d 699, 708 (9th Cir. 2017)).

19          Beginning with proper warnings, it is undisputed the deputies gave many clear warnings

20   and instructions, and it is undisputed those warnings largely proved ineffective in obtaining

21   Gonzalez's compliance or securing his arrest.  Immediately before Gonzalez took the axe in his

22   hand, Lewis had ordered him not to fight the dog, without effect.  This evidence suggests the

23   government had an interest in using some force, but it does not show as a matter of law that it had

24   an interest in using deadly force.  Nor does the evidence show deputies warned they might use

25   deadly force in particular, let alone whether such a warning was possible in the moment.  *See Vos*,

26   892 F.3d at 1034 (reasoning similarly).

27          Next, as for Gonzalez's mental state, plaintiffs point out that some of the deputies knew

28   Gonzalez had made outlandish and nonsensical claims about the building and his father.  *See,*

1   *e.g.*, Pls.' Opp'n at 3–4.  They argue his statements alerted the deputies to the need for less

2   intrusive or less violent tactics.  *See id.*  A plaintiff "cannot establish a Fourth Amendment

3   violation based merely on bad tactics that result in a deadly confrontation that could have been

4   avoided." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015) (citation and

5   quotation marks omitted).  But obvious signs of mental distress are relevant considerations.

6   "[I]ndications of mental illness create a genuine issue of material fact about whether the

7   government's interest in using deadly force was diminished." *Vos*, 892 F.3d at 1034.

8        Finally, available alternatives: plaintiffs argue the officers had alternatives to deadly force.

9   They argue the deputies could have fired another beanbag shot or could have allowed the dog to

10  continue biting Gonzalez and pulling him out from behind the bush.  *See* Pls.' Opp'n at 3–4.  The

11  court cannot conclude on this record whether those alternatives were truly available or reasonable

12  in the moment.  It is unclear whether Lewis could have instructed his dog to release Gonzalez

13  after he saw the axe.  It is unclear whether Gonzalez was swinging the axe at Lewis, and if so,

14  whether Lewis could have avoided injury by merely backing away.  It is unclear whether the dog

15  could have pulled Gonzalez out from behind the bush while avoiding injury.  Lewis himself

16  believes that was not possible.  *See* Lewis Decl. ¶ 11.

17       Finally, plaintiffs contend Gonzalez was permissibly using the axe to defend himself from

18  the deputies, *see* Pls.' Mem. at 16–17, under the rule that "[a] person has the limited right to offer

19  reasonable resistance to an arrest that is the product of an officer's bad faith or provocative

20  conduct," *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007) (quotation marks

21  omitted) (citing *United States v. Span*, 970 F.2d 573, 580 (9th Cir. 1992)).  Defendants argue in

22  opposition that the Supreme Court has rejected this theory of "provocation."  *See* Defs.' Opp'n

23  at 5 (citing *County of Los Angeles v. Mendez*, 581 U.S. 420 (2017)).  In *Mendez*, the Supreme

24  Court rejected a different type of "provocation" claim, i.e., that officers can violate the Fourth

25  Amendment by "intentionally or recklessly provok[ing] a violent confrontation, if the provocation

26  is an independent Fourth Amendment violation."  581 U.S. at 426–27.  The rule plaintiffs invoke

27  is different.  After *Mendez*, courts within the Ninth Circuit have continued to hold that "[a] person

28  has the limited right to offer reasonable resistance to an arrest that is the product of an officer's

1  personal frolic." *Huerta v. County of Tulare*, No. 17-01446, 2024 WL 871729, at *8 (E.D. Cal.

2  Feb. 28, 2024) (quoting *Blankenthorn*, 485 F.3d at 479); *see also, e.g.*, *Savage v. City of Whittier*,

3  689 F. Supp. 3d 781, 809 (C.D. Cal. 2023) (applying this rule), *aff'd in relevant part*, No. 23-

4  55812, 2025 WL 900433 (9th Cir. Mar. 25, 2025) (describing this surviving rule as "clearly

5  established" within the Ninth Circuit).  But in any event, this court cannot conclude as a matter of

6  law one way or the other whether Gonzalez was resisting "reasonably" within his "limited" right

7  do so.  As discussed above, the video does not show what he was doing or attempting to do just

8  before the officers fired the deadly shots.  Nor does any other evidence in the current record.

9          In sum, the court finds defendants could not prove at trial that the government had an

10  interest in using deadly force based on the nonviolent crimes the deputies at first suspected.

11  However, genuine disputes of material fact do prevent the court from determining as a matter of

12  law whether the government had an interest in using deadly force at some point based on

13  immediate threats to the officers' safety or a need to overcome Gonzalez's resistance.  Genuine

14  disputes of material fact also prevent the court from determining as a matter of law whether the

15  deputies had viable, non-lethal alternatives to deadly force and whether the government's

16  interests in using force were diminished based on signs of mental illness or distress.

17          **3.      Balancing Interests**

18          These genuine disputes of material fact prevent the court from balancing the relevant

19  interests as a matter of law in the third part of the *Graham* test.  On the one hand, it would be

20  reasonable for a jury to find Gonzalez was suffering from a mental illness and did not swing the

21  axe at Lewis.  It also would be reasonable for a jury to find Lewis could have avoided harm to

22  himself and others by stepping back and warning the deputies would shoot if Gonzalez did not

23  drop the axe.  If a jury made these findings, it could decide deadly force was unreasonable.  On

24  the other hand, a jury could also reasonably find that Gonzalez was swinging the axe at Lewis,

25  that a further warning would have been ineffective, and that the risk of serious or deadly injury

26  was virtually unavoidable by any less than lethal means.  If a jury made these findings, it could

27  also find deadly force was a reasonable response.

1    In sum, the court cannot say as a matter of law whether the government's interests

2 justified deadly force under the third part of the *Graham* test.  *See Vos*, 892 F.3d at 1034

3 ("Balancing all of these considerations, a reasonable jury could find that the force employed was

4 greater than is reasonable under the circumstances.  Summary adjudication . . . was therefore

5 inappropriate." (citation omitted)); *Longoria*, 873 F.3d at 709 ("The immediacy of the threat and

6 [the officer's] objective reasonableness in the totality of the circumstances depend upon the

7 resolution of disputes of material facts . . . .  The question of whether a constitutional violation

8 occurred is therefore a matter for the jury to determine.").

9               **4.     Qualified Immunity**

10    Defendants argue they are shielded from liability for using deadly force by their qualified

11 immunity.  *See* Defs.' Mem. at 19–21.  Officers can be entitled to summary judgment even

12 though genuine disputes of material fact prevent the court from deciding as a matter of law

13 whether their actions violated the Fourth Amendment.  That is because "[a] government official's

14 entitlement to qualified immunity depends" not only on "whether there has been a violation of a

15 constitutional right," but also on "whether that right was clearly established at the time of the

16 officer's alleged misconduct."  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir.

17 2019) (citation and quotation marks omitted).  If the deputies' conduct did not violate any

18 "clearly established" law, then they are immune, no matter whether that conduct was in fact

19 unconstitutional.  *See Vos*, 893 F.3d at 1035.

20    "'Clearly established' means that, at the time of the officer's conduct, the law was

21 sufficiently clear that every reasonable official would understand that what he is doing is

22 unlawful."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (other quotation marks and

23 citation omitted).  The clearly established law must be defined with a "high degree of specificity,"

24 *id.* at 590 (internal marks and citation omitted), and the court must match the "particular

25 circumstances" and "context" to controlling law, *id*.  The "existing precedent," in other words,

26 "must have placed the statutory or constitutional question beyond debate," and must "squarely

27 govern[] the specific facts at issue."  *Kisela v. Hughes*, 584 U.S. 100, 104–05 (2018) (per curiam)

28 (internal quotation marks and citation omitted).  It must be "dictated by controlling authority or a

robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 63 (internal citations and quotation marks omitted).

"The Supreme Court has provided little guidance as to where courts should look to determine whether a particular right was clearly established at the time of the injury." *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). It has often assumed, however, that controlling circuit precedent clearly establishes the law for purposes of §1983. *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). The Ninth Circuit has, moreover, held unambiguously that in addition to Supreme Court precedent, "a right can also be clearly established by this circuit's precedent." *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022). "If the right is clearly established by decisional authority of the Supreme Court or this Circuit, [the court's] inquiry should come to an end. On the other hand, when there are relatively few cases on point, and none of them are binding, [the court] may inquire whether the Ninth Circuit or Supreme Court, at the time the out-of-circuit opinions were rendered, would have reached the same results." *Boyd*, 374 F.3d at 781 (citations and quotation marks omitted).

As between the parties, it is the plaintiff's burden to show a right was clearly established at the time, not the defendant's. *Davis v. Scherer*, 468 U.S. 183, 197 (1984). The court, too, has an obligation to draw on its own "full knowledge" and "other relevant precedents," as it is a "question of law" whether the right was indeed "clearly established at a particular time." *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (citations, alterations and quotation marks omitted).

When an officer asserts qualified immunity at summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656 (citations omitted). Rather, "[w]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." *Nehad*, 929 F.3d at 1140 (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)). But officers are entitled to qualified immunity if their actions violated no clearly established law even when the evidence is taken in the light most favorable to the non-moving party. *See Kisela*, 584 U.S. at 105–06(granting qualified immunity at summary judgment after construing evidence in light most favorable to non-moving plaintiff).

17

1    These rules are not "specific to qualified immunity; it is simply an application of the more general

2    rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine

3    the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 572

4    U.S. at 656 (quoting *Anderson*, 477 U.S. at 249).

5        Here, although it is not defendants' burden to show their actions were justified, they do

6    argue affirmatively that "case law permits officers to protect their own safety when a suspect may

7    be armed." Defs.' Mem. at 20–21.  They cite *Shaw v. City of Selma*, in which the Eleventh

8    Circuit granted qualified immunity to a police officer who fatally shot a noncompliant, mentally

9    ill suspect who was wielding an axe "within a few feet" of another officer.  *Id.* at 20 (quoting 884

10   F.3d 1093, 1099–1100 (11th Cir. 2018)).  *Shaw* is not controlling, but it is quite a different case in

11   any event.  In *Shaw*, the responding officers had been called to respond to "disorderly conduct" at

12   a restaurant by a man who had come to the restaurant with a knife a few days before.  *Id.* at 1097.

13   Some of the responding officers already knew the man and warned others he was dangerous.  *See*

14   *id.*  When the officers arrived, they found the man armed with a hatchet.  *Id.*  The defendant

15   officer fired the shot that killed the man after he had stopped, turned around, and begun

16   advancing on another officer.  *See id.*  He was less than five feet from that officer when he was

17   shot.  *Id.*  Here, by contrast, the deputies were responding to a silent alarm, not a call for

18   disorderly conduct.  *See* Sierra Decl. ¶ 3.  No evidence shows they knew Gonzalez or whether he

19   was dangerous before they arrived at the warehouse or when they first confronted him there.  No

20   evidence shows the deputies had reasons to believe Gonzalez was violent.  He did not advance on

21   any officers.  Instead, as explained in the previous section, the record is inconclusive about what

22   he did or intended to do with the axe during his struggle with the dog and Lewis.

23       Plaintiffs rely for their part on the Ninth Circuit's decision in *Deorle*.  *See* Pls.' Mem. at

24   18 (citing 272 F.3d at 1282–83).  In *Deorle*, police had responded to a 911 call reporting that a

25   man, the plaintiff, had "lost control of himself" and was screaming and banging on the walls of a

26   house.  *Id.* at 1276.  He let his family leave the house, but he refused to leave the house himself,

27   and he refused to allow the officers in.  *Id.*  Officers set up a roadblock and called in a negotiation

28   team.  *See id.*  The man acted erratically while the negotiators were on their way: he roamed the

property, shouted at officers to kill him, and brandished two weapons—a hatchet and an unloaded plastic crossbow—but dropped both at the officers' instructions. *See id.* at 1276–77. Soon after he dropped the crossbow, he began walking toward one of the officers with a can or bottle in his hand. *See id.* at 1277. Without warning, a different officer standing in a secure position fired a beanbag shot and hit him in the face. *See id.* at 1277–78. He survived, but lost his eye and suffered other head injuries. *See id.* at 1278. The district court granted summary judgment to the officer on the man's excessive force claim, but the Ninth Circuit reversed. *See id.* at 1282–83.

Viewing the evidence in the light most favorable to the plaintiff, the circuit held "the force was excessive compared to the governmental interests at stake." *Id.* at 1284. The court also denied qualified immunity to the officer even though "there [was] no prior case prohibiting the use of this specific type of force in precisely the circumstances." *Id.* at 1274 (internal citations and quotations omitted). "Every police officer should know," the court held, "that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285.

Although the Circuit's opinion in *Deorle* remains binding, the Supreme Court has twice cautioned lower courts not to read it broadly when deciding whether the law is clearly established. *See Kisela*, 584 U.S. at 106; *Sheehan*, 572 U.S. at 614–16. First, the Supreme Court distinguished *Deorle* in *Sheehan*, a case in which the plaintiff "was dangerous, recalcitrant, law-breaking, and out of sight" inside an apartment. 575 U.S. at 614. In *Deorle*, by contrast, as summarized above, the plaintiff "was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him . . . , and had not committed any serious offense." *Sheehan*, 575 U.S. at 614 (quoting *Deorle*, 272 F.3d at 1275). Second, in *Kisela*, the Supreme Court rejected *Deorle* as "clearly established law" because the plaintiff was "armed with a large knife," was "within striking distance" of another person, "ignored the officers' orders to drop the weapon," and the "situation unfolded in less than a minute." 584 U.S. at 107. *Sheehan* and

1  *Kisela* thus limit how broadly *Deorle* can be extended when deciding what law is clearly

2  established in response to an officer's assertion of qualified immunity: if officers encounter an

3  armed person, if they know that person is dangerous, if the circumstances are unpredictable or

4  urgent, or if the dangerous person is close enough to seriously injure an officer or someone else,

5  then the Ninth Circuit's decision in *Deorle* may not put the officers on notice that potentially

6  deadly force would be unconstitutional.

7      There are some similarities between this case and *Deorle*. The plaintiff in *Deorle* was

8  showing signs of delusion, as was Gonzalez. Both the plaintiff in *Deorle* and Gonzalez had also

9  complied with only some of the officers' instructions. But *Deorle* is quite a different case from

10  this one in other crucial respects. Unlike the officer in *Deorle*, Lewis did not fire at Gonzalez

11  from a position of relative safety. He fired the ultimately fatal shots in the middle of a hand-to-

12  hand struggle. Unlike the officer in *Deorle*, Lewis and Silva did not have time to watch Gonzalez

13  and see what he might do with the weapon after he took it in his hand. The axe appeared

14  suddenly in Gonzalez's hand in the middle of a hand-to-hand struggle. Unlike the plaintiff in

15  *Deorle*, Gonzalez had not complied with previous instructions to drop his weapon. He picked it

16  up after refusing repeatedly to come out from where he was sitting in the middle of a fight with an

17  officer and police dog. The plaintiff in *Deorle* was holding a bottle or can. Gonzalez, by

18  contrast, was holding an axe. In short, under *Deorle* it is not "clear enough that every reasonable

19  official would interpret it to establish" that Silva and Lewis could not employ deadly force against

20  Gonzalez. *Wesby*, 583 U.S. at 590. Plaintiffs must rely on different authority to show the law

21  was clearly established.

22      Plaintiffs also cite the Ninth Circuit's 2018 decision in *Vos*. *See* Pls.' Mem. at 18–19

23  (citing 892 F.3d 1024). In *Vos*, "officers confronted a reportedly erratic individual that took

24  refuge in a 7-Eleven, cut someone with scissors, asked officers to shoot him, simulated having a

25  firearm, and ultimately charged at officers with something in his upraised hand." 892 F.3d at

26  1035. As he charged toward them, the officers shot him with a less-lethal 40mm projectile

27  launcher and with conventional rifles. *See id.* at 1029–30. The Ninth Circuit held that the

28  officers' conduct violated the Fourth Amendment. The officers were not responding to a report

1  of a crime, but rather only "erratic behavior." *Id.* at 1031. The man had "little opportunity . . .to

2  flee" once officers arrived. *Id.* A reasonable jury could have concluded the man "was not an

3  immediate threat to the officers" because they were positioned in cover behind their patrol cars.

4  *Id.* at 1032. The officers had less intrusive options than rifles, and the man was unwell. *See id.* at

5  1031–34.[2]

6         The officers' situation in *Vos* did resemble the deputies' situation in this case in some

7  ways. They were confronting a man who was not suspected of a violent crime and was not likely

8  to flee, but who was behaving erratically and who was holding a weapon. But the scenarios were,

9  overall, quite different. In *Vos*, the officers were in a position of safety behind their patrol cars

10  and at some distance from the man they shot. Gonzalez, by contrast, first took hold of the axe

11  while he was in a hand-to-hand struggle with Lewis and his dog. And so, like *Deorle*, the court

12  cannot agree that *Vos* should have made clear to the deputies in this case that they could not use

13  deadly force against Gonzalez.

14         Finally, plaintiffs cite several cases for a more general point: that deadly force might be

15  unreasonable and unconstitutional even if employed against people carrying knives and guns. *See*

16  Pls.' Mem. at 19 (citing *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013); *George v.*

17  *Morris*, 736 F.3d 829 (9th Cir. 2013); *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011);

18  *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997); and *Curnow By and Through Curnow v.*

19  *Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991)). In none of the cited cases did a person take

20  hold of the potentially deadly weapon suddenly in the midst of a hand-to-hand struggle, as

21  Gonzalez did in this case. In *Hayes*, officers shot a man with a knife, but the evidence could have

22  proven he was attempting to surrender at the time. 736 F.3d at 1227–28, 1232–33. In *George*,

23  the evidence could have proven officers shot an elderly man in his own home without any

24  provocation. 736 F.3d at 839. In *Glenn*, officers shot an intoxicated and emotionally disturbed

___

[2] Although the circuit concluded the officers had used excessive force, it held they were entitled to qualified immunity based on several of the circuit's previous decisions, in which the court had found police responded reasonably to armed and aggressive suspects. *See id.* at 1035–36 (citing *Woodward v. City of Tucson*, 870 F.3d 1154 (9th Cir. 2017); *S.B. v. County of San Diego*, 864 F.3d 1010 (9th Cir. 2017); *Lal v. California*, 746 F.3d 1112 (9th Cir. 2014); *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005)).

1   man who was holding a pocketknife at his own throat. 673 F.3d at 872–80. In *Harris*, a case

2   about the infamous standoff at Ruby Ridge, federal officers shot a man from a distance as he

3   attempted to retreat into the cabin where he lived. 126 F.3d at 1203–04. And in *Curnow*, the

4   victim had a gun, but his back was to the officers, and he had not pointed the gun at anyone.

5   952 F.2d at 325.

6        The court also has drawn upon its independent review of "other relevant precedents" in

7   place at the time. *Elder*, 510 U.S. at 516 (citations and quotation marks omitted). Rather than

8   settled, clear or well-established, that law sent conflicting signals to the officers in this case. On

9   the one hand, the Ninth Circuit had held in some cases that officers may not use potentially

10  deadly force against non-compliant suspects, even if they are holding weapons and behaving

11  erratically. *See, e.g.*, *Vos*, 892 F.3d at 1029–34; *Deorle*, 272 F.3d at 1278, 1282–84. On the other

12  hand, the Ninth Circuit and Supreme Court had held that deadly force was a reasonable and

13  constitutional response to non-compliant suspects bearing weapons or potential weapons within

14  striking distance of an officer or bystander. *See Kisela*, 584 U.S. at 105–06; *Woodward*, 870 F.3d

15  at 1162–63; *Lal*, 746 F.3d at 1114–15, 1117–18; *Blanford*, 406 F.3d at 1113–14, 1117–18.

16       In addition, even when the evidence is viewed in the light most favorable to plaintiffs, it

17  would show Lewis and Silva fired their handguns based on a mistaken but reasonable belief that

18  Gonzalez was swinging the axe at Lewis. *See* Lewis Decl. ¶ 13 ("I suddenly realized that

19  Gonzalez was swinging a hatchet at me."); Silva Decl. ¶ 16 ("I . . . immediately saw a hand axe or

20  hatchet swinging from a downward position to an upward position right in front of my face. The

21  axe was moving toward Deputy Lewis."). Officers are entitled to qualified immunity based on

22  reasonable mistakes of fact such as this. In *Kisela*, for example, the Supreme Court held the

23  officers were entitled to qualified immunity based in part on their subjective but mistaken belief

24  that a suspect was threatening another person with a large kitchen knife. *See* 584 U.S. at 102,

25  105–06. In *Blanford*, the Ninth Circuit held the officers were entitled to qualified immunity

26  based on their reasonable but mistaken belief that a man holding a sword was ignoring their

27  shouted commands to stop and drop the weapon; in reality, he was wearing headphones and could

28  not hear them, so he only "appeared" to be flaunting the officers' commands. 406 F.3d at 1118–

19.  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

The court therefore grants defendants' motion for summary judgment on claim one. Plaintiffs' cross-motion is denied.

### B.   Claim Two: Rights to Familial Relationship under § 1983

Defendants move for summary judgment on plaintiffs' claim that Deputy Lewis and Deputy Silva violated plaintiffs' right to familial relationships by acting with an intent to harm unrelated to legitimate law enforcement purposes.  Defs.' Mem. at 22.  As noted above, plaintiffs do not seek summary judgment on this claim, but they do oppose defendants' motion.

The Fourteenth Amendment's Due Process Clause protects against the arbitrary or oppressive exercise of government power.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998).  "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct."  *Lemire v. Cal. Dept. of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  "[T]he Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense," *Lewis*, 523 U.S. at 847 (quotation marks and citation omitted), or if it "violates the decencies of civilized conduct," *id.* at 846 (quotation marks and citation omitted).  Mere negligence or liability grounded in tort does not meet the standard for a substantive due process violation.  *Id.* at 848–49.

"Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."  *Wilkinson*, 610 F.3d at 554 (citing *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  But "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (citing *Porter*, 546 F.3d at 1140).  In *Porter*, for example, the Ninth Circuit found actual deliberation was

23

1  not practical in a five-minute encounter that evolved quickly and forced the officers to make

2  "repeated split-second decisions." 546 F.3d at 1139 (citation and quotation marks omitted). As

3  the Ninth Circuit observed, the Supreme Court has rejected a "narrow" concept of deliberation,

4  rejecting the deliberate indifference standard for high-speed chases "even though logically an

5  officer giving chase could deliberate even while accelerating after a suspect." *Id.* at 1139–40

6  (citing *Lewis*, 523 U.S. at 851 n.11). But "[w]hen an officer creates the very emergency he then

7  resorts to deadly force to resolve, he is not simply responding to a preexisting situation. His

8  motives must then be assessed in light of the law enforcement objectives that can reasonably be

9  found to have justified his actions." *Id.* at 1141.

10      Here, at the beginning of the encounter between the deputies and Gonzalez, there was no

11  emergency. As deputies approached Gonzalez, he first raised his hands, then sat still until they

12  used force. Plaintiffs argue the jury must resolve factual disputes about whether the deputies

13  themselves escalated the situation that led to Gonzalez's death, in part by disregarding signs that

14  he was not acting rationally or was suffering from delusions. *See* Pls.' Mem. at 20–21. The court

15  agrees. Although the deputies' later actions appear to have occurred in a compressed timeline, a

16  jury could reasonably find this is, on the whole, a case in which the defendant officers created

17  "the very emergency [they] then resort[ed] to deadly force to resolve." *Porter*, 546 F.3d at 1141.

18  Lewis's and Silva's motives "must then be assessed in light of the law enforcement objectives

19  that can reasonably be found to have justified [their] actions." *Id.* A jury could find the deputies'

20  interests in investigating the silent alarm bore no connection to their escalating threats and uses of

21  force, especially in light of Gonzalez's confused statements about the building and his father.

22      Defendants also assert qualified immunity to this claim. They contend their actions did

23  not violate clearly established law. *See* Defs.' Mem. at 23. They cite *Shaw*, discussed above, *see*

24  884 F.3d 1093; *Schulz v. Long*, 44 F.3d 643 (8th Cir. 1995); and *Young v. Scott Township*, 469 F.

25  Supp. 3d 298 (M.D. Penn. 2020). In none of these decisions did the courts evaluate claims under

26  the Fourteenth Amendment's Due Process Clause protections against the arbitrary or oppressive

27  exercise of government power, so none is relevant. But again, it is plaintiffs' burden to show the

28  deputies' actions violated law that was clearly established at the time.

1   Plaintiffs do not contend specifically the officers' actions violated clearly established law,

2   but their brief does cite several appellate decisions that predated the deputies' confrontation with

3   Gonzalez, including *Porter*, discussed above, 546 F.3d 1131; *Moreland v. Las Vegas*

4   *Metropolitan Police Department*, 159 F.3d 365 (9th Cir. 1998); and the Supreme Court's

5   foundational opinion in *Lewis*, 523 U.S. 833.

6   In *Porter*, the Ninth Circuit reversed the district court's order denying summary judgment

7   to the defendant officer because the district court had applied "an incorrect standard of culpability

8   to the officer's actions." 546 F.3d at 1132. The circuit remanded the matter to the district court

9   because the record did not permit it "to make the appropriate factbound appraisal" of the officer's

10  actions. *Id.* at 1141. Because the circuit did not decide whether the officer's actions violated the

11  Fourteenth Amendment, its opinion in *Porter* does not establish clearly whether defendants'

12  actions in this case violated clearly established law.

13  Nor did the Circuit's decision in *Moreland* clearly establish that the deputies violated the

14  Fourteenth Amendment. In *Moreland*, officers arrived at an ongoing gunfight outside a bar in the

15  early hours of the morning. *See* 159 F.3d at 368. A man was shooting at someone across a

16  parking lot, and fifty to one hundred people were trapped in the crossfire. *See id.* The officers

17  ordered the man to stop shooting, but he did not, so they shot and killed him. *Id.* The circuit held

18  the officers had not violated the Fourteenth Amendment: they "were responding to the extreme

19  emergency of public gunfire and did not intend to commit any harm unrelated to the legitimate

20  use of force necessary to protect the public and themselves." *Id.* at 373. This case involves no

21  similar emergency and no similar threats to public safety.

22  Finally, in *Lewis*, a sheriff's deputy in his patrol car struck and killed a boy at the end of a

23  high-speed chase. *See* 523 U.S. at 836–37. The Court held that the deputy was entitled to

24  summary judgment on the family's Fourteenth Amendment claim. *See id.* at 854–55. The deputy

25  had not acted with a purpose to cause harm, which is the relevant standard in the split-second

26  circumstances of an officer's decision to pursue a high-speed chase. *See id.* The Court's

27  reasoning was specific to those circumstances and does not show Silva's or Lewis's actions

28  violated the Fourteenth Amendment.

1     This court's own searches have not returned any decisions showing defendants' actions

2  violated clearly established law.  The court therefore **grants** defendants motion for summary

3  judgment on claim two.

4         **C.     Claim Three: Negligence and Wrongful Death**

5     To prove negligence, "a plaintiff must show that [the] defendant had a duty to use due

6  care, that he breached that duty, and that the breach was the proximate or legal cause of the

7  resulting injury." *Hayes v. County of San Diego*, 57 Cal. 4th 622, 629 (2013) (alteration in

8  original) (citations omitted).  "[D]uty is a critical element of negligence liability." *Id.*  The

9  California Supreme Court "ha[s] long recognized that peace officers have a duty to act reasonably

10  when using deadly force." *Id.* (citations omitted).  To determine reasonableness, state negligence

11  law, like the Fourth Amendment reasonableness test, requires consideration of the totality of the

12  circumstances surrounding any use of deadly force.  *See id.*  "[T]he California Supreme Court has

13  clarified that 'state negligence law . . . is broader than federal Fourth Amendment law.'"  *See C.V.*

14  *ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 & n.6 (9th Cir. 2016) (alterations in

15  original) (quoting and citing *Hayes*, 57 Cal. 4th at 639).

16         Construing the evidence in the light most favorable to plaintiffs, and given the broader

17  protections of state negligence law, a reasonable jury could conclude it was unreasonable for

18  defendants to shoot Gonzalez, even after he took hold of the axe, when considering the totality of

19  the circumstances, including that he had been sitting still, partly complying with orders with his

20  hands in the air and speaking incoherently.  *See Hayes*, 57 Cal. 4th at 639 (under California law,

21  officers' "tactical conduct and decisions preceding the use of deadly force are relevant

22  considerations . . . in determining whether the use of deadly force gives rise to negligence

23  liability").  And as explained in section IV.A above, defendants have not demonstrated as a

24  matter of law that they used reasonable force.  The court therefore cannot find as a matter of law

25  that the homicide was "justifiable." *See Adamson v. City of San Francisco*, No. 13-05233, 2015

26  WL 5467744, at *10 (N.D. Cal. Sept. 17, 2015) (citing denial of summary judgment on excessive

27  force claim as basis for denying summary judgment on negligence claim).  Defendants have cited

1   no other relevant immunity.  Defendants' motion for summary judgment on claim three is

2   therefore **denied**.

3          **D.      Claims Four and Five: Bane Act and Battery**

4          Under the California Government Claims Act (GCA), a claim for death, personal injury,

5   or damage to personal property must be filed within six months of the incident giving rise to a

6   claim.  *See* Cal. Gov't Code § 911.2(a); *Gen. Sec. Servs. Corp. v. County of Fresno*, 815 F. Supp.

7   2d 1123, 1131 (E.D. Cal. 2011).  "Each theory of recovery against the public entity must have

8   been reflected in a timely claim."  *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051,

9   1060 (2013) (quotation and citation omitted).  The GCA applies to Bane Act and battery claims.

10  *See, e.g.*, *Harris v. Escamilla*, 736 F. App'x 618, 621–22 (9th Cir. 2018) (unpublished) (affirming

11  dismissal of Bane Act claim for lack of compliance with GCA); *Flock v. County of Alameda*, No.

12  12-01003, 2012 WL 4051120, at *3 (N.D. Cal. Sept. 13, 2012) (holding GCA applies to battery

13  claims).

14         Defendants argue plaintiffs filed no claim under the GCA, and as a result are barred from

15  proceeding with their Bane Act and battery claims.  In response, plaintiffs cite no evidence that

16  could show they complied with the GCA's presentation requirements.  The court therefore **grants**

17  defendants' motion for summary judgment on claims four and five.

18  **V.     CONCLUSION**

19         Plaintiff's partial motion for summary judgment (ECF No. 39) is **denied**.  Defendant's

20  motion for summary judgment (ECF No. 34) is **granted in part** as to claims one, two, four and

21  five and **denied in part** as to claim three.

22         A final pretrial conference is set for **June 5, 2025 at 10:00 a.m.** in Courtroom 3 (KJM)

23  before Senior District Judge Kimberly J. Mueller at 501 I Street, Sacramento, CA 95814.  *See*

24  E.D. Cal. L.R. 282.  The parties shall meet and confer and file a joint pretrial statement no later

25  than **two weeks prior** to the final pretrial conference.

26         The provisions of Local Rule 281 shall apply with respect to the matters to be included in

27  the joint pretrial statement.  At least one of the attorneys who will conduct the trial for each of the

28  parties shall attend the final pretrial conference.  All motions in limine must be filed in

1    conjunction with the joint pretrial statement.  In most cases, motions in limine are addressed and

2    resolved on the morning of the first day of trial.  The parties may alert the court at the final

3    pretrial conference and in their final joint pretrial statement that a particular motion or motions

4    should be resolved earlier.  At the final pretrial conference, the court will set a briefing and

5    hearing schedule on the motions in limine as necessary.  The parties are reminded that a motion in

6    limine is a pretrial procedural device designed to address the admissibility of evidence.  The court

7    looks with disfavor upon dispositional motions presented at the final pretrial conference or at trial

8    in the guise of motions in limine.

9         IT IS SO ORDERED.

10   DATED:  April 15, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE